BOSTON MARITIME CORPORATION et al. v. OCEAN S. S. CO. OF SAVANNAH. ATLANTIC COAST LUMBER CORPORATION v. SAME. OCEAN S. S. CO. OF SAVANNAH v. BOSTON MARITIME CORPORATION et al.

(District Court, D. Massachusetts. January 5, 1927.)

Nos. 2894, 2931, and 3007.

1. Collision ⚙=46—Schooner and steamship both held at fault; schooner for changing course, and steamship for proceeding full speed, though not understanding meaning of schooner's lights.

Schooner and steamship both *held* at fault for collision, by reason of schooner suddenly changing course prior to collision and steamship's proceeding at full speed, although information afforded by lights on schooner was confusing; collision being at night, when character, course, and speed of other vessel were not visible.

2. Collision ⚙=77—Steamship held not at fault for collision with schooner because of placing lookout so far forward that wind and spray interfered with vision.

Steamship *held* not at fault in collision of schooner because of having lookout placed so far forward that wind and spray interfered with ability to see ahead in heavy weather. Under such conditions much must be left to the judgment of the master.

At Law. Separate actions by the Boston Maritime Corporation and others against the Ocean Steamship Company of Savannah, by the Atlantic Coast Lumber Corporation against the Ocean Steamship Company of Savannah, and by the Ocean Steamship Com-

pany of Savannah against the Boston Maritime Corporation and others. Decree for divided damages.

Stephen R. Jones and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for Boston Maritime Corporation and others.

Russell, Moore & Russell, of Boston, Mass., for Ocean Steamship Co. of Savannah.

Bigham, Englar & Jones, of New York City, for Atlantic Coast Lumber Corporation.

MORTON, District Judge. These cases arise out of a collision on the high seas between the four-masted schooner Wemyss and the steamship City of Montgomery. The facts are as follows:

The collision occurred shortly after 1 a. m. on Saturday, November 22, 1924, at a point about 25 miles southwest of Diamond Shoals Lightship. The Wemyss, loaded with lumber, was coming up the coast on a voyage from Georgetown, S. C., to Baltimore, Md. The Montgomery was bound from New York to Savannah. The weather was clear, the wind about south, increasing in force and hauling toward the southeast. It freshened decidedly shortly after the collision, and was accompanied by heavy rain squalls.

The master of the schooner, Captain Da Costa, testifies that at the time of the collision she was under mizzen sail, foresail, forestaysail, and jib; that her spanker and topsails had been taken in some time before the accident, and the mainsail was being taken in when the steamer's light was first reported; that it was then about ahead, and he judged it to be 8 or 10 miles away; that the vessels approached and established courses green to green, on which they would have passed in safety, but that the steamer, when broad off on the schooner's starboard bow, suddenly turned sharply to her starboard directly across the path of the schooner; that at the last moment, when collision was inevitable, the schooner's helm was ordered hard astarboard, but that she had not swung to port appreciably before the vessels came together. All the witnesses on the schooner testify to this general story of the collision, but there are certain inconsistencies in their stories. For instance, Cross, who was working on the sails at the time of the accident, says that he saw the range light and the red light of the steamer and afterwards, when she was close to them, both side lights. This indicates either that the steamer turned to port at that time, which nobody says took place, or that the schooner moved across the

steamer's course. And Connolly, the schooner's lookout, says that the first of the steamer's side lights which he made out was the red one, about ahead.

The witnesses on the steamer give a very different account of the accident. They say that they first observed almost ahead a white glare, and somewhat later in the same place a red light; that they changed course slightly to starboard in order to pass red to red; that this continued until suddenly they saw the red light change to green, indicating that the other vessel was swinging to port, i. e., across the steamer's bow; that the vessels were then close together, and the steamer's helm was put hard aport and her engines were backed, but too late to avoid collision. There are discrepancies in the testimony of her witnesses also, especially of Bucic, her helmsman.

There is general agreement that the collision was nearly at right angles. The effects of it were to carry away the schooner's bowsprit and to crush in her bow so severely that she filled almost at once. Being loaded with lumber, she did not sink, but became derelict, and drifted in that condition until her crew were taken off by the battleship Utah late on Sunday. After floating around for several weeks as an abandoned derelict, the Wemyss was picked up and towed into Bermuda. Photographs taken shortly after her arrival there, and before any repairs had been made, are offered in evidence. There can be no doubt that, while the schooner was floating exposed to the action of the sea, a considerable amount of injury was done to her. I should not think it safe to draw inferences from the details of her condition when she arrived at Bermuda. But the heavy injuries caused by the collision would still be sufficiently unchanged to afford evidence of what occurred. There has been considerable discussion and disagreement whether the steamer sheared across the schooner's bow, or whether the schooner ran into the side of the steamer near the latter's bow. I do not think that the point is of much significance; but from the appearance of the injuries and the testimony submitted I conclude that the schooner ran into the port side of the steamer a short distance abaft the latter's bow.

It is, of course, clear that the evidence is in irreconcilable conflict—one of the not unknown class of cases in which each vessel maintains that the collision was brought about by an unexpected and unjustified change of course by the other.

The story which the men on the schooner tell about the steamer's movement appears improbable. Why should a steamer running a straight course in open sea, after establishing a green to green passing with another vessel, suddenly turn sharply across the oncoming vessel's bow? It is not easy to give a reasonable answer to this question. Counsel for the schooner endeavored to put the vessels in a red to red position. But they cannot be so placed, where a turn to starboard by the steamer will bring about such a collision as here occurred. Nor is it easy to believe, as the steamer contends, that the schooner, running free in a fresh breeze, was allowed, with her officers on deck, to go off the wind almost to the jibing point, many points off her proper course, and directly into the path of an oncoming steamer.

Up to the trial before me, the schooner's witnesses had consistently maintained that she had not changed course before the collision. At the trial, however, in answer to a question put by the court, the captain of the schooner testified that, at the time when he took in the mainsail, he had luffed the schooner, turning some four or five points to starboard. If this testimony be accepted, the way in which the accident occurred is pretty clear. The schooner had headed up toward the wind to get in her mainsail. That brought her red light toward the steamer. The indistinct white light first noticed by the men on the steamer was the reflection of the flashlight used in working on the sail; later they saw the red light. Having got her sail down and secured, the schooner swung off and filled away. This would turn her bow towards the steamer, and would shut out the red light, and show the green in its place, which is just what the witnesses on the steamer say they saw. The swinging off movement was delayed until the steamer was so close that a collision resulted.

[1] While I am naturally hesitant about accepting this testimony as to the schooner's luffing when no such fact had been developed by the able and experienced admiralty counsel on either side, it affords what seems to me the only reasonable explanation of the accident. My question to Capt. Da Costa was brusque and sharp, but I do not think he was overborne into agreeing to something that he knew was untrue and bore heavily against his vessel. Moreover, there are in the testimony many little things which tend to support the view which I have suggested. For instance, Eriksen, the boatswain, says that the collision happened as they had "just about finished" taking in the mainsail. After the sea attains a certain degree of severity,

. a vessel cannot safely luff; but the testimony as a whole does not indicate that such conditions existed at this time. If they did, I do not see why Capt. Da Costa should not have said so. On all the evidence. I find that the accident was caused by reason of the schooner's sudden change of course. It follows ·that she was at fault; and I so find.

As to the steamer: It is said that she was at fault for an improper lookout, and for approaching at full speed and trying to pass too close at hand a vessel whose course and speed she had not definitely made out. [2] The complaint against the lookout is that in heavy weather he was placed so far forward that the wind and spray interfered with his ability to see ahead; that he ought to have been stationed further back, perhaps even on the bridge. In cases of collision in fog it has repeatedly been held that the lookout must be stationed as far forward as possible, and vessels have been held at fault for not carrying him there. But courtroom navigation ought not to be applied in disregard of what was done by alert and capable masters, except in clear cases, and where, as the courts well know, their view has the support of experienced and careful mariners. I am not prepared to say that the Montgomery was at fault for carrying her lookout forward on the night in question.

The other point urged against her seems to me much more doubtful. The testimony of her own witnesses shows that her officer in charge was in doubt about the situation ahead. He did not understand the white glimmer which had been seen—the flashlight on the sails; he knew that, whatever the object ahead might be, it was not broadening out as they approached it; and his uncertainty had led him to go to call the master before the emergency arose, leaving the steamer at full speed while he did so. Carlson, the steamer's lookout, admits that he was nervous about the situation and glanced apprehensively back at the wheel house. It was evident, while there was still time to slow or maneuver, that the steamer was going to pass very near the vessel which she was approaching. If all the circumstances had been clearly visible, there might have been no danger in this, and in constricted waters it might have been necessary. But at night, when the character, course, and speed of the other vessel were not visible, and the information afforded by her lights was confusing, and the situation was by no means clear, and on an open ocean where there was plenty of room, I do not think that the steamer should have held her speed as long as she did, nor

have cut things so fine. While the question is not free from doubt, I am of opinion that the steamer was at fault in these particulars.

It follows that there must be a decree adjudging each vessel at fault and for divided damages.